**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In Re: | : | |
| | : | |
| **RIVER ENTERTAINMENT CO.,** | : | **Bankruptcy No.  07-024515JAD** |
| | : | |
| **Debtor,** | : | **Chapter 11** |
| | : | |
| ********************************************* | : | |
| **ARDI LIMITED PARTNERSHIP,** | : | **Adv. No. 10-2495JAD** |
| | : | |
| **Plaintiff,** | : | **Related to Doc Nos. 35, 38** |
| | : | |
| **v.** | : | |
| | : | |
| **THE BUNCHER COMPANY,** | : | |
| | : | |
| **Defendant/Third Party Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **RIVER ENTERTAINMENT CO.,** | : | |
| | : | |
| **Third Party Defendant.** | : | |
| _____ | X | |

**<u>MEMORANDUM OPINION</u>**

The matters before the Court are dueling motions for summary judgment.  One *Motion for Summary Judgment* is jointly filed by the Plaintiff, ARDI Limited Partnership ("ARDI"), and the Debtor/Third Party Defendant, River Entertainment Co. ("River Entertainment").  Pursuant to their *Motion for Summary Judgment,* the movants seek the entry of an order granting ARDI's complaint for conversion of certain assets.  Defendant/Third Party Plaintiff The Buncher Company ("Buncher") has also filed a *Motion for Summary Judgment*.  Pursuant to its motion, Buncher seeks dismissal of that complaint against it.  At the center of these motions is a dispute regarding the enforcement of a prior consent order entered by this Court, that will resolve the issue of

the ownership and alleged conversion of a certain barge facility moored along the Allegheny River in Pittsburgh, Pennsylvania. For the reasons expressed below, the *Motion for Summary Judgment* filed by Buncher shall be granted and the *Motion for Summary Judgment* jointly filed by ARDI and River Entertainment shall be denied.

**I.**

The Debtor in this case, River Entertainment, operated an entertainment complex commonly known as "The Boardwalk" which included a nightclub and restaurant on a barge facility for approximately seventeen years. The Boardwalk was operated in two buildings which, along with other "Improvements", sat atop four separate barges that were structurally bound together (the "Barge Facility"). The Barge Facility was moored in the Allegheny River in Pittsburgh, Pennsylvania and was connected to the land by several bridges and utility lines. Buncher owned the adjacent land that allowed access to the Barge Facility. Buncher also held various permits issued by the Department of Environmental Protection that allowed for the mooring of the Barge Facility in the Allegheny River.

Buncher and River Entertainment entered into a Facility Lease Agreement that provided for the lease of the Barge Facility and for the benefits conferred by the various permits that allowed the Barge Facility to be moored in the Allegheny River.[1] (See Doc. #35, *Buncher's Motion for Summary Judgment*, Ex. "1".) ARDI, along with several other

---

[1] River Entertainment has asserted that it held the permits that allowed for the Barge Facility mooring. This is disputed by Buncher and the evidence of record is that such permits were not in the name of River Entertainment in its own right. Rather, the "Water Permits" were held by Buncher and were leased to River Entertainment as part of the Facility Lease Agreement. (See Doc. #35, *Motion for Summary Judgment*, Affidavit of Dino DePaulo, ¶¶3, 4.)

entities, signed a Joinder to the Facility Lease Agreement.[2]  (Id.)  According to counsel for

ARDI and River Entertainment, there was common ownership of the two entities.  (See

Case No. 07-24515JAD, Doc. # 75, p. 28).  For purposes of convenience, the Debtor/Third

Party Defendant River Entertainment and Plaintiff ARDI shall be referred to collectively

as "ARDI" for the remainder of this Opinion.

Pursuant to the Facility Lease Agreement, ownership of the Barge Facility vested

in ARDI during the term of the lease.  (See Doc. #35, *Buncher's Motion for Summary

Judgment,* Exhibit "1", ¶16.2).  If an event of default occurred and was continuing at the

end of the lease term, ownership of the Barge Facility then would vest in Buncher without

further action.  (Id.)  If there was no default at the conclusion of the lease term, title to the

Barge Facility would remain in the name of ARDI.  (Id. at ¶16.3.)  At that point, ARDI was

then, at its sole expense, required to remove the Barge Facility within sixty (60) days

following the lease expiration.  (Id.)  If the Barge Facility remained after that sixty day

period, it was deemed to be abandoned and would become the property of Buncher.  (Id.)

On July 16, 2007, the Debtor filed a voluntary Chapter 11 case.  On April 3, 2008,

a hearing was held on its Disclosure Statement and Plan.[3]  Title to the Barge Facility and

its fate were at issue in the case. At the April 3, 2008 hearing, ARDI and Buncher entered

---

[2] Beyond executing a Joinder to the Facility Lease Agreement, the role of ARDI to this summary judgment proceeding is unclear.  The Complaint filed in state court by ARDI asserts that it "owned" the Barge Facility.  There is nothing of record in this proceeding beyond the bald assertion that would support that contention.  The Disclosure Statement filed in this bankruptcy case states that River Entertainment subleased the property to ARDI who in turn subleased it to yet another entity.  (See Doc. #44, unnumbered p. 2.)  However, no documentation is of record. The Plan of Reorganization states that ARDI owns the Barge Facility (see Doc. #43); however, Buncher disputes this assertion.  (See Adv. No. 10-2495, Doc. #5, ¶¶23-24).

[3] At the time of the April 3, 2008 hearing, this case was presided over by the Honorable Bernard Markovitz.

into a Consent Order regarding the Barge Facility.[4]  The Consent Order bore similarities

to the Facility Lease Agreement in terms of a timetable and manner of disposition of the

Barge Facility.  The Consent Order provided in relevant part at paragraph 3:

> If an agreement with a buyer or user, as referenced in Paragraph 2, is not
> executed within sixty (60) days of the date of this Order, then Debtor and
> ARDI shall either: A) on or before the date that is sixty (60) days after the
> date of this Order, give notice to the Buncher Company that they will, at
> their sole cost and expense, fully and completely remove the Barge facility
> from its current location including payment of all insurance, security and
> other costs, which removal shall be accomplished within the date that is
> ninety (90) days from the date of this Order.* or B) if the notice is not timely
> given, the Debtor and ARDI shall be deemed to have abandoned the Barge
> facility to the Buncher Co. and relinquished all rights and interest therein
> on the date that is sixty (60) from the date of this order.  In either event, the
> bankruptcy case shall be dismissed pursuant to this Order, except that the
> Court shall retain jurisdiction for any enforcement of or dispute under this
> Order.
>
> *and upon such removal, the Buncher Co. will relinquish any claim or
> interest in the Barge facility.

(See Doc. #38, *Plaintiff's Motion for Summary Judgment,* Ex. A.).  The Consent Order also

provided that this Court would retain jurisdiction to enforce the Consent Order or resolve

any dispute under the Consent Order.  (Id.)

Pursuant to the Consent Order, ARDI was required to notify Buncher within sixty

days, or on or before June 3, 2008, whether or not it had found a buyer for the Barge

Facility.  If there was no proposed buyer, ARDI was required to completely remove the

Barge Facility on or before July 3, 2008.  Alternatively, ARDI could do nothing and

---

[4] ARDI continued its occupation of the premises after the filing.  On November 1, 2007,
Buncher sought relief from stay and sought to compel the Debtor to vacate and return
possession of the leased premises.  Relief from stay was granted to Buncher to pursue an
ejectment action and ARDI was ordered to vacate the premises within ten days.
Reconsideration of that order was sought by ARDI.  An evidentiary hearing was set for
September 3, 2008 on the question of title to the Barge Facility and personal property on the
leased premises in connection with the relief from stay motion.  The entry of the Consent Order
eliminated the need for the September 3 hearing.

relinquish any claim or interest in the Barge Facility, which would be effective June 3, 2008.

On May 30, 2008, counsel for ARDI sent notice to Buncher that there was no proposed buyer for the Barge Facility and that ARDI intended to proceed with removing it. Specifically, counsel stated that the Debtor "will, at its sole cost and expense, **fully and completely remove the barge facility from its current location**, including payment of all insurance, security and other costs." (See Doc. #38, *Plaintiff's Motion for Summary Judgment,* Exhibit "B") (emphasis added).

After notice was provided that the Barge Facility would be "fully and completely removed", ARDI proceeded to remove only the bridges and utility lines that provided land access and utility service to the Barge Facility.  In its complaint filed in state court and in its *Motion for Summary Judgment,* ARDI alleges that it removed the bridges on August 6, 2008.  (See Doc. #38, ¶11).  However, Buncher asserts that this is in error and that the bridge removal occurred on July 6, 2008.  ARDI admitted to the July 6, 2008 date when it was asserted by Buncher in its Statement of Undisputed Facts (see Doc. # 37, *Statement of Undisputed Facts*, ¶15; Doc. #47, *Response To Statement of Undisputed Facts,* ¶15).  In either event, the record demonstrates that the bridge removal occurred <u>after</u> the July 3, 2008 deadline for full and complete removal.

On July 7, 2008, Buncher sent a letter to counsel for ARDI stating that ARDI had failed to comply with the Consent Order because it had not removed the Barge Facility. Further, the letter notified ARDI that any rights it may have possessed in the Barge Facility were forfeited due to its failure to timely remove the Barge Facility.  On July 9, 2008, Buncher again wrote to counsel for ARDI reiterating its position that it had not complied with the Consent Order and that it had forfeited any rights in the Barge Facility.

Buncher further advised that it would proceed with the dismantling and removal of the Barge Facility.

A final letter was sent by Buncher to counsel for ARDI dated July 24, 2008 again advising of its position that ARDI had failed to comply with the Consent Order, thereby entitling Buncher to dismantle and remove the Barge Facility. The letter also advised that Buncher would begin the demolition process on July 28, 2008 and if there was any objection by ARDI, it should file a motion with the bankruptcy court.

ARDI did not respond to the July 24, 2008 letter. Nor did it file an objection to the demolition with this Court. Buncher subsequently proceeded to have the Barge Facility dismantled and fully removed. No action was taken by ARDI upon receiving notice prior to, during or after removal of the Barge Facility by Buncher.

Subject to a retention of jurisdiction over any dispute relating to the Consent Order, the bankruptcy case was ultimately dismissed on June 3, 2008. (See Case No. 07-24515JAD, Doc. #60, *Notice to Creditors and Other Parties in Interest*). On August 2, 2010, approximately two years later, a complaint was filed by ARDI against Buncher in the Court of Common Pleas of Allegheny County alleging conversion of the Barge Facility and seeking punitive damages. The complaint was removed to this Court by Buncher on September 9, 2010 and the bankruptcy case was reopened.[5] During the course of this adversary proceeding, a third party complaint was filed against ARDI by Buncher.

The parties have each filed motions for summary judgment and supporting briefs. The motions have been orally argued and the matter is now ripe for adjudication.

---

[5] The count for punitive damages was dismissed on December 20, 2010 pursuant to a Motion to Dismiss filed by Buncher. (See Doc. #16).

**II.**

Motions for summary judgment in adversary proceedings are governed by Fed. R. Bankr. P. 7056 which makes Fed. R. Civ. P. 56 applicable in the instant adversary proceeding.   The rule provides, in relevant part, that summary judgment should be rendered "if movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   In considering a motion for summary judgment, the Court may rely upon the contents of the pleadings, the discovery and disclosure materials on file, and any affidavits.   See Fed. R. Civ. P. 56(c).   A dispute of material fact is "genuine" if a reasonable jury could return a verdict for the nonmoving party.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   Upon the moving party meeting its burden, the burden shifts to the non-moving party who must "do more than simply show that there is some metaphysical doubt as to the material facts."   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

While ARDI characterizes the instant proceeding as the adjudication of its state law action for conversion, both summary judgment motions before the Court hinge entirely on the enforcement of the Consent Order.   Indeed, the parties agree that the Consent Order dictates their respective rights and interests in the Barge Facility.

In Pennsylvania, conversion "is the deprivation of another's right of property in, or use or possession of a chattel, or other interference therewith without the owners consent and without lawful justification."   Prudential Ins. Co. of America v. Stella, 994 F. Supp. 318, 323 (E.D. Pa. 1998) (citing cases, including Universal Premium v. York Bank & Trust Co., 69 F.3d 695, 704 (3d Cir. 1995)).   Where a plaintiff has no right to possession of property at the time of the alleged conversion, the Plaintiff's action for conversion will fail

as a matter of law.  See Krajewski v. American Honda Finance Corp., 557 F.Supp. 2d 607-608 (citing Eisenhauer v. Clock Tower Assocs.,582 A.2d 33, 36 (Pa. Super. 1990)).  Upon a review of the Consent Order and the confessed acts of the parties, this Court finds there is no genuine dispute that ARDI abandoned all ownership rights in the Barge Facility to Buncher prior to commencing its conversion action.  Therefore, this Court will grant Buncher's *Motion for Summary Judgment* and dismiss the conversion complaint asserted by ARDI.

**III.**

The Consent Order required ARDI to either: 1) "execute an agreement with a buyer or user" of the Barge Facility on or before June 3, 2008; or 2) "completely remove" the Barge Facility on or before July 3, 2008.  If ARDI accomplished neither of these acts, the Consent Order was clear that ARDI would be "deemed to have abandoned" all rights and interest in the Barge Facility to Buncher effective June 3, 2008.

ARDI's urges this Court to read the Consent Order to mean that because ARDI gave notice prior to June 3, 2008 that it intended to remove the Barge Facility, ARDI had not abandoned its interest in the Barge Facility.  ARDI also alleges that by removing the bridges and utility lines which connected the Barge Facility to the land, it rendered the Barge Facility a "vessel" under "federal law and regulations" and thus the Barge was "completely remove[d]" as required by the Consent Order.  This Court finds both of ARDI's interpretations of the Consent Order to be without merit.

The Court does not find ARDI's reading of the Consent Order, that it could prevent abandonment by merely notifying Buncher of its intent to remove the Barge Facility, to be accurate or persuasive.  ARDI's interpretation ignores the language denoted by the asterisk at what would otherwise be the conclusion of the sentence in paragraph (3)(A).

This additional language states that only upon "such removal", will Buncher relinquish its claim or interest in the Barge Facility.  "Such removal" refers back to the earlier part of the sentence in (3)(A) requiring ARDI to "fully and completely" remove the Barge Facility by July 3, 2008.  Thus under the plain language in the Consent Order, ARDI's mere notice of its intent to move the Barge Facility did not prevent abandonment in any interest it had in the Barge Facility to Buncher.

ARDI's suggestion that removal of the bridges and utility lines constituted "full and complete removal" of the Barge Facility is also contrary to the plain language of the Consent Order.   The language of the Consent Order clearly provides that removal of the Barge Facility would be nothing less than removing "the Barge facility **from its current location**... ."  (Emphasis added).  Merely allowing the Barge Facility to remain where it was moored does not remove it "from its current location".

Not only does the language of the Order itself bely the argument set forth by ARDI, but ARDI's own action - and inaction - contradict its argument.  At the hearing held on April 3, 2008, counsel for ARDI stated "If they'll [Buncher] let it go, I think if we had a reasonable period of time, **we'll take it away**, at worst case." (See Doc. #52, Ex. A, p. 26) (emphasis added).  Further, the agreement between the parties was set forth on the record by counsel for Buncher who described that:

> COUNSEL: What we've agreed, Your Honor, is that for a period of sixty days, the debtor and ARDI will see if they can identify a buyer or user for this facility and within that sixty-day period, if we have produced an agreement on terms acceptable to the parties, including The Buncher Company, then we will return to this court in sixty days for the confirmation of the plan.
>
> If we don't have such an agreement within sixty days, then, by that sixtieth day, the debtor and Arty [sic] will have the option to either give notice to The Buncher Company that they will remove, fully and completely, the barge facility and will get that done within ninety days from today – from the date of this order –
>
> THE COURT: From today?

           Counsel: Right.  They'll have an extra thirty days to do the removal.  Or, if they don't give that notice within the sixty days that they're going to do that, then they're deemed to have abandoned the barge facility - -

           The Court: On the sixty-first day?

           Counsel: Correct, Your Honor - - to The Buncher Company and then Buncher will accomplish the removal.  And in those circumstances, the bankruptcy case will be dismissed because there won't be any plan for us to come back to and confirm.

See id., Ex. A, pp. 32-33.

Counsel for ARDI did not object, clarify, modify or in any way dispute the agreement as stated on the record.  For these reasons, the Court finds ARDI's alleged interpretation of the Consent Order to be without merit.[6]

Having failed to timely remove the Barge Facility pursuant to the Consent Order, ARDI did not have any right to possession of it.  Without a right to possession of the Barge Facility, ARDI is precluded from successfully asserting an action for conversion, as there could be no interference with that right by Buncher.  See Serafini v. Mariani, No. 3: CV-08-0469, 2010 WL 1342926, *7 (M.D. Pa., Mar. 31, 2010) ("[W]here, as here, a party has not retained an ownership interest in the property delivered to another, it may not maintain an action for conversion of that property.")

In the alternative, there is no genuine dispute of material fact that ARDI's conversion action is barred by the statute of limitations.  Conversion actions in Pennsylvania are subject to a two year statute of limitations as set forth in 42 Pa. C.S.A. § 5524(7).  See Shonberger v. Oswell, 530 A.2d 112, 114 (Pa. Super. 1987)("Conversion is an action at law and is, therefore, subject to the two-year statute of limitations.")  The statute of limitations begins to accrue when the " 'the first significant event necessary to

---

       [6]  Because the Court finds that ARDI failed to comply with the Consent Order, it need not address Buncher's assertion that following several defaults by ARDI, Buncher was the owner of the Barge Facility pursuant to the Facility Lease Agreement.

make the claim suable' occurs." <u>Lake v. Arnold</u>, 232 F.3d 360, 366 (3d Cir. 2000) (citations omitted).  There is no genuine dispute that ARDI's complaint was filed on August 2, 2010, which is two years after Buncher commenced demolition of the Barge Facility on July 28, 2008.

While ARDI asserts that the two year period began to run on August 6, 2008, ARDI has not pointed to anything that would contravene the July 24, 2008 letter by Buncher stating that demolition was set to commence on July 28, or the Affidavit of Dino DePaulo (Assistant Vice President of Leasing and Property Management for Buncher), stating that "on July 28, 2008 the demolition work commenced."  (<u>See</u> Doc. #35, *Affidavit of Dino DePaulo*, ¶ 14).  In an Affidavit filed by Thomas Jayson ("part owner of both River Entertainment Company and ARDI, LP"), Mr. Jayson only denies witnessing "any removal efforts on July 28, 2008", not that removal commenced on that date.  Thus, Mr. Jayson's denial is insufficient to show a genuine dispute of material fact.  <u>Matsushita Elec.</u>, 475 U.S. at 586 (the non-moving party must do more than show that there is some metaphysical doubt as to the material facts).

Accordingly, Buncher's request for dismissal of the conversion complaint must be granted, and ARDI's *Motion for Summary Judgment* will be denied.

## **IV.**

In a supplemental brief, ARDI relies on the recent Supreme Court decision in <u>Stern v. Marshall</u>, -- U.S.--,  131 S. Ct.  2594, 180 L. Ed. 2d 475 (2011), in attempting to argue that this Court lacks the ability to enter a final judgment both on its claim and Buncher's counterclaims.  This Court cannot accept ARDI's assertion for two reasons.  First, <u>Stern</u> does not apply in the instant matter as resolution of the current proceeding is entirely dependent on this Court's interpretation and enforcement of its own Consent Order, and

is **not** dependent upon the adjudication of an independent state-law cause of action. Second, even in the event that <u>Stern</u> was found to apply, both parties have effectively consented to the entry of a final judgment by this Court.

ARDI contends that this Court does not have authority to hear the competing claims or enter final judgment because "the pending actions are state common law claims, do not stem from the bankruptcy proceeding and will not be resolved by resolution of the claim filed by Buncher against the Debtor. . . ." (Doc. #52, pp. 3-4). ARDI incorrectly alleges that its common law claim does not "stem" from the bankruptcy proceeding.

In <u>Stern</u>, the Supreme Court held that bankruptcy courts lack the constitutional authority to enter a final judgment on a state law tort counterclaim, when the adjudication of that counterclaim would not "necessarily be resolved in the claims allowance process." <u>Stern</u>, 131 S. Ct. at 2618. In its analysis, the Supreme Court explained that the constitutional issue arose because of the separation of powers principles implicated in Article III of the United States Constitution, and the nature of the "core" counterclaim asserted in <u>Stern</u>.

Under Article III, the "judicial power of the United States" must vest **exclusively** in judges that enjoy lifetime tenure and protection from salary diminution, known as Article III judges. U.S. Const. Art. III, § 1. As bankruptcy judges are Article I judges, occupying positions created by Congress, they are forbidden from exercising this "judicial power". The Supreme Court noted that with regard to the counterclaim asserted in <u>Stern</u>, Congress "exceeded" the limits of Article III, by enabling bankruptcy courts to "issue final judgments" which may only be reviewed by Article III judges under "the usual limited

appellate standards" requiring "marked deference . . . to the bankruptcy judges' findings of fact."[7] Stern, 131 S. Ct. at 2610-11 (citations omitted).

The Stern opinion also acknowledged the limited nature of this constitutional issue in recognizing that Article III only prevents Congress from "withdraw[ing] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." Stern, 131 S. Ct. at 2609 (quoting Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 18 How. 272, 284, 15 L. Ed. 372 (1856)). Such matters are commonly known as Article III cases and controversies. The Supreme Court then explained that the final adjudication of matters which could be categorized as involving "public rights" would not offend Article III. Id. at 2612 (citations omitted). In discussing the scope of this "public rights exception" the Supreme Court stated that this exception was limited "to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority." Id. at 2613.

Thus, the question decided in Stern was "a 'narrow' one", as the Supreme Court held that Congress had only exceeded its authority in "one isolated respect", i.e. providing bankruptcy courts with the ability to finally adjudicate state law tort counterclaims to objection to a proof of claim, absent consent of the parties. Id. at 2620. In fact, the Supreme Court's entire public rights analysis in Stern occurred from the viewpoint of whether the specific state law tort counterclaim asserted fell into any of Supreme Court's

---

[7] This "deference" arises from Federal Rules of Bankruptcy Procedure 8013 and 7052 (adopting Fed. R. Civ. P. 52(a)(6)), which require that the a bankruptcy court's findings of fact "shall not be set aside unless clearly erroneous." See Fed. R. Bankr. P. 7052, 8013.

admittedly "varied formulations" of the public rights exception.[8] Id. at 2614.  To interpret

the Stern opinion in any broader sense would "meaningfully change[] the division of labor"

between the bankruptcy courts and the district courts, contrary to the stated intent of the

Supreme Court.  Id. at 2620.

Applying this narrow interpretation, Stern is plainly inapposite to the matter before

the Court.  Despite its origination as a state law claim for conversion, the instant matter

hinges entirely on this Court's ability to interpret and enforce the terms of its own

Consent Order.  The entry of the Consent Order was the intended resolution of several

issues in the bankruptcy which had the Barge Facility and its disposition at their root.

This Court has already concluded that because ARDI did not remove the Barge Facility

and, thus, did **not** have a "right to immediate possession" of the Barge Facility, ARDI is

incapable of successfully asserting a claim for conversion as a matter of law.  The filing

of the defective action in state court does not serve to sever ARDI from its obligations and

agreements it entered into under the Consent Order, nor does it divest this Court of its

ability to interpret the terms of its own Order.[9]  In fact, the Consent Order itself operates

a res judicata as to any claims that ARDI may have to the Barge Facility.  See Katchen

v. Landy, 382 U.S. 323, 334-35 (1966).

---

[8]  The Supreme Court in Stern admitted that its past "discussion of the public rights exception . . . has not been entirely consistent." Stern, 131 S. Ct. at 2611.

[9]  Through the language of the Consent Order the bankruptcy court specifically retained jurisdiction "for any enforcement of or dispute under this Order." (See Case No. 07-24515JAD, Doc. #56, Order of Court).  The conversion action clearly implicated a dispute under the Order, thereby resting jurisdiction with the bankruptcy court.  In the notice of dismissal sent to creditors,  jurisdiction was specifically retained for enforcement of or a dispute regarding the Consent Order.  (See Case No. 07-24515JAD, Doc. #60, Notice to Creditors and Parties in Interest).  Bankruptcy courts have jurisdiction to enforce their own prior orders.  See Travelers Indem. Co. v. Bailey, 129 S.Ct 2195, 2205 (2009).  Cf. In re Washington Mut., Inc., 461 B.R. 200, 214-15 (the right of bankruptcy courts to exercise jurisdiction over settlements is supported by historical practice).

It is clear that the Consent Order could and, in fact, did "arise in" the bankruptcy proceeding.  Therefore, this Court finds that because the crux of actual dispute is the interpretation of the Consent Order, this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) (A) and (O).  See Factory Mut. Ins. Co. v. Panda Energy Int'l, Inc. (In re Hereford Biofuels, L.P), Bankr. No. 09-30453-SGJ-7, Adv. No. 10-03341, 2012 Bankr. LEXIS 22, at *3-4 (Bankr. N.D. Tex. Jan. 3, 2012) (holding that the court could finally adjudicate an adversary proceeding where the interpretation of its previously entered sale order was at the "crux" of the dispute between the two non-debtor parties to the adversary).  As such, the narrow holding in Stern simply does not apply to this Court's ability to finally adjudicate the matter before it.   See Moore v. Paladini (In re CD Liquidation Co., LLC), 462 B.R. 124, at 135-36 (Bankr. D. Del. 2011) (finding that Stern did not apply to bar the bankruptcy court from enforcing the terms of its own confirmation order which enjoined a plaintiff from filing a derivative suit in district court).

## **V.**

Even if the holding in Stern did apply to the instant matter, this Court finds that both parties have consented to entry of final judgment by the bankruptcy court.  This Court further concludes that such consent is sufficient to allow this Court to hear and finally determine the instant matter, regardless of whether it is statutorily defined as "core" or "non-core".

To determine whether, and to what extent, consent to bankruptcy court adjudication remains viable following the Stern decision, courts must answer three questions: A) are parties capable of waiving their right to adjudication of an Article III case or controversy by an Article III tribunal? B) is the matter of a type that may be

adjudicated based on consent?  and C) can consent can be implied from the acts or inaction of the parties in question?

A.

In determining whether parties are capable of consenting to final adjudication of a case or controversy by a non-Article III tribunal, courts must consider both the personal and structural protections of Article III.[10] See Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc., 725 F.2d 537, 541 (9th Cir. 1984) (citing Chadha v. INS, 634 F.2d 408, 422, 431 (9th Cir. 1980), aff'd, 462 U.S. 919, 77 L. Ed. 2d 317, 103 S. Ct. 2764 (1983)).

The Supreme Court has consistently upheld a litigant's ability to waive its "personal" right to have its matter heard by an Article III judge.  See Peretz v. United States, 501 U.S. 923, 936 (1991) ("[L]itigants may waive their personal right to have an Article III judge preside over a civil trial.") (citing Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 848, 106 S. Ct. 3245, 92 L. Ed. 2d 675 (1986)).

However, the Supreme Court has simultaneously concluded that the separation of powers principles implicated in the "structural" protections of Article III, are beyond the ability of individual parties to waive.  See e.g., Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 850 (1986) (finding that parties cannot cure the constitutional defect in permitted non-Article III tribunals to exercise the "judicial power of the United States"

---

[10]  The Supreme Court in Stern recognized these two protections as well.  See Stern, 131 S. Ct. at 2609 ("Separation-of-powers principles are intended, in part, to protect each branch of government from incursion by the others. Yet the dynamic between and among the branches is not the only object of the Constitution's concern. The structural principles secured by the separation of powers protect the individual as well.") (quoting Bond v. United States, 131 S. Ct. 2355, 180 L. Ed. 2d 269, 2011 WL 2369334 (2011)).

through consent, the same as they cannot consent to extend the subject-matter jurisdiction of the courts); Peretz, 501 U.S. at 937-39.

Despite this conclusion, the Supreme Court has repeatedly upheld final adjudication by non-Article III tribunals when it has concluded that the structural protections of Article III are not implicated.  See Peretz, 501 U.S. at 937-39; Schor, 478 U.S. at 851-52.  Whether the structural protections of Article are "implicated", depends primarily on the degree of control exercised by Article III judges over of the non-Article III tribunal in question.  See e.g., Peretz, 501 U.S. at 937-39; United States v. Raddatz, 447 U.S. 667, 685-86, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (1980) (Blackmun, J., concurring). This Court finds that based on the degree of control exercised by Article III judges over bankruptcy courts, the structural protections of Article III are not implicated in the bankruptcy statutory scheme and, therefore, parties may effectively consent to final adjudication of matters by non-Article III bankruptcy courts.

In Peretz v. United States, the Supreme Court held that there was no constitutional defect when, following the consent of the parties, a district court judge delegates the duty of conducting voir dire in a felony proceeding to a magistrate judge, because no structural protections were implicated.  Peretz v. United States, 501 U.S. 923 (1991).  In so concluding, the Court recognized that under the Magistrate's Act, Article III judges maintained a substantial amount of control over both the magistrate judges and the matters delegated to them.  Id. at 927-28.  Specifically, the Court noted that district court judges were responsible for appointing magistrate judges, removing them from office, and maintaining plenary authority over what matters were delegated to the magistrate judges once they were appointed.  Id. at 937-39.  Citing United States v. Raddatz, 447 U.S. 667 (1980), the Supreme Court held that because the entire process of magistrate

adjudication "takes place under the district court's total control and jurisdiction," there was no danger that the structural protections of Article III would be violated. Id. at 937.

Similar to the Magistrates Act, the current statutory scheme in bankruptcy provides Article III judges with substantial "control" over the bankruptcy courts. For example, bankruptcy judges are appointed and subject to removal by Article III judges. See 28 U.S.C. § 152(a), (e). Article III judges also have the ability to withdraw the reference of cases to the bankruptcy courts upon a motion of any party-in-interest, or *sua sponte* for "cause shown". See 28 U.S.C. § 157(d). Certainly "cause shown" would include the fact that the civil litigation at issue is an Article III case or controversy. Perhaps most importantly, motions to withdraw the reference must be heard by Article III district court judges, ensuring all parties access to an Article III forum. See Fed R. Bankr. P. 5011(a). Consequently is it an Article III judge that has plenary authority over the matter if he or she chooses to exercise such authority.

There is, however, one distinction between the statutory scheme for magistrates under 28 U.S.C. § 636(b)(3) as described in Peretz, and the statutory scheme in bankruptcy with regard to core matters. While section 636(b)(3) of the Judiciary Code does not contain an express provision for de novo review by an Article III court, the Supreme Court found that "nothing in the statute precludes a district court" from reviewing the magistrate's judges determinations de novo, if such review was requested. See Peretz, 501 U.S. at 939. The jurisdictional scheme in bankruptcy, however, does allow for Article III judges to engage in ordinary appellate review of the findings of fact entered by the bankruptcy courts with regard to core matters. See Fed. R. Bankr. P. 7052

and 8013.[14]  But, for Article III cases and controversies heard in the bankruptcy courts,

post-Stern, that appellate review is de novo as a matter of Constitutional law when

litigants do not consent to entry of a final judgment by the bankruptcy court.    Where

consent is present, the Supreme Court has recognized the ability of Article I judges to

finally adjudicate civil matters absent de novo review by any Article III court.[15]  See Roell

v. Withrow, 538 U.S. 580, 590-91 (2003).  As the majority in Roell wrote:

> We think the better rule is to accept implied consent where, as here, the
> litigant or counsel was made aware of the need for consent and the right to
> refuse it, and still voluntarily appeared to try the case before the Magistrate
> Judge. Inferring consent in these circumstances thus checks the risk of
> gamesmanship by depriving parties of the luxury of waiting for the outcome
> before denying the magistrate judge's authority. Judicial efficiency is served;
> the Article III right is substantially honored.

Id. at 590.  Nothing in Stern abrogates this precept.

Where the parties have consented, the scope of review provisions contained in the

Bankruptcy Code and Magistrate's Act are identical.  Under section 636(c)(1) of Title 28,

full-time magistrate judges may hear and enter judgment on any civil proceeding "[u]pon

the consent of the parties... ."  Id. Similarly, pursuant to 28 U.S.C. § 157(c)(2), bankruptcy

courts may hear and determine any non-core matter "with the consent of all the parties

to the proceeding... ."  Id.  The constitutionality of the Magistrate's Act which permits

parties to consent to final adjudication of civil matters by non-Article III magistrate judges

has been consistently upheld.  See In re Olde Prairie Block Owner, LLC, 457 B.R. 692,

---

[14]  Federal Rule of Civil Procedure 52(a)(6) (adopted by Fed. R. Bankr. P. 7052) states
"Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly
erroneous, and the reviewing court must give due regard to the trial court's opportunity to
judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6).

[15]  Additionally, the Supreme Court has held that such a requirement does not, in and
of itself, run afoul of the Article III requirement.  See Crowell v. Benson, 285 U.S. 22, 51 (1932)
("[T]here is no requirement that, in order to maintain the essential attributes of the judicial
power, all determinations of fact in constitutional courts shall be made by judges.").

701 (Bankr. N.D. Ill. 2011) (citing cases from the United States Courts of Appeals for the First,[16] Second,[17] Third,[18] Fourth,[19] Fifth,[20] Sixth,[21] Seventh,[22] Eighth,[23] Ninth[24] and D.C.[25] Circuits); In re Safety Harbor Resort and Spa, 456 B.R. 703, 718 (Bankr. M.D. Fla. 2011) ("Although no court has addressed the constitutionality of [28 U.S.C. § 157(c)(2)], ten circuit courts of appeal have upheld the constitutionality of the Federal Magistrate Statute... .").

As the structural protections of Article III appear not to be implicated or eroded in the bankruptcy scheme when the parties consent, this Court can easily conclude that a party's waiver of the personal protections of Article III is sufficient to allow bankruptcy courts to finally adjudicate Article III cases and controversies.  To find otherwise would be to completely ignore recent Supreme Court precedent in cases upholding the constitutionality of the Magistrate's Act.  See Monette v. United States (In re Custom

---

[16] Goldstein v. Kelleher, 728 F.2d 32, 34-35 (1st Cir. 1984).

[17] Collins v. Foreman, 729 F.2d 108, 109 (2d Cir. 1984).

[18] Wharton-Thomas v. United States, 721 F.2d 922, 924-930 (3d Cir. 1983).

[19] Gairola v. Va. Dep't of Gen. Servs., 753 F.2d 1281, 1284-85 (4th Cir. 1985).

[20] Puryear v. Ede's, Ltd., 731 F.2d 1153, 1154 (5th Cir. 1984).

[21] K.M.C. Co., Inc. v. Irving Trust Co., 757 F.2d 752, 755 (6th Cir. 1985).

[22] Geras v. Lafayette Display Fixtures, Inc., 742 F.2d 1037, 1038 (7th Cir. 1984).

[23] Lehman Bros. Kuhn Loeb, Inc. v. Clark Oil & Ref. Corp., 739 F.2d 1313, 1314 (8th Cir. 1984) (en banc).

[24] Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc., 725 F.2d 537, 540 (9th Cir. 1984) (en banc).

[25] Fields v. Wash. Metro. Area Transit Auth., 743 F.2d 890, 893, 240 U.S. App. D.C. 46 (D.C. Cir. 1984).

Contractors. LLC), 462 B.R. 901, 910 (Bankr. S.D. Fla. 2011) (quoting Olde Prairie Block

Owner, LLC, 457 B.R. 692, 701 (Bankr. N.D. Ill. 2011)).  Such a finding would also ignore

the portion of the Stern opinion wherein the Supreme Court reaffirmed the viability of the

consent provisions with regard to non-core matters under 28 U.S.C. § 157(c)(2).  Stern,

131 S. Ct. at 2607-08.[26]   Thus, consent of the parties does permit non-Article III

bankruptcy courts to finally adjudicate Article III cases and controversies.

B.

With regard to the second question, this Court finds that consent will apply to

permit final adjudication by non-Article III bankruptcy courts of non-core and core

matters alike.

There is no dispute that bankruptcy courts may finally adjudicate non-core matters

upon the consent of all parties to the proceeding.  This ability is codified at 28 U.S.C. §

157(c)(2), and was recognized by the Supreme Court in Stern.  See Stern, 131 S. Ct. 2607-

08.

Following a need created by Stern, it also appears that an extension of the consent

provision contained in 28 U.S.C. § 157(c)(2) to core matters is both logical and

appropriate.  See Bayonne Medical Center v. Bayonne/Omni Dev., LLC (In re Bayonne

Medical Center), Bankr. No. 07-15195, Adv. No. 09-1689, 2011 WL 5900960, *7 (Bankr.

D.N.J. Nov. 1, 2011) (unpublished decision) (holding that by expressly consenting to final

---

[26]   At least one court has found support for this proposition based on the Supreme
Court's endorsement of the entry of final decisions by non-Article III arbitrators, where
the parties have contractually agreed to binding arbitration of their case or controversy.  See
Oxford Expositions, LLC v. Questex Media Group, LLC (In re Oxford Expositions, LLC), Case
No. 10-16218-DWH, Adv. No. 11-01095-DWH, 2011 WL 4054872, *8 (Bankr. N.D. Miss. Sept.
12, 2011) (citing generally AT&T Mobility, LLC v. Concepcion, 131 S.Ct. 1740, 179 L.Ed.2d 742
(2011)).

adjudication by the bankruptcy court as to all non-core matters, the liquidating trustee had also consented to final adjudication of statutorily designated "core" matters).

Prior to <u>Stern</u> bankruptcy courts maintained the ability to finally adjudicate all core matters regardless of consent.  Therefore, because there was no reason for a "consent" provision to exist, the lack of such a provision is without consequence.  Additionally, all of the structural protections present in the bankruptcy jurisdictional scheme with regard to non-core matters are present with regard to core matters as well.  For example, Article III judges maintain the same control over bankruptcy judges regardless of whether the bankruptcy judge is hearing a core or non-core matter, and parties retain the right to seek withdrawal of the reference regardless of whether the opposing party has defined the matter as core or non-core in its pleadings.  <u>See</u> 28 U.S.C. §§ 152(a)-(c), 157(a).  In addition, it seems only logical that a statutory scheme which provides bankruptcy courts with the ability to finally adjudicate matters "related to" a bankruptcy case via consent should apply to matters that purportedly "arise in" or "arise under" the same.  As a result, this Court concludes that consent applies to provide bankruptcy courts with the ability to finally adjudicate both statutorily defined core and non-core matters brought before them.[27]

---

[27] Some courts have found that the <u>Stern</u> holding creates a nominal third category of matters consisting of Article III cases and controversies, which are statutorily defined as core but that must be subject to de novo review by an Article III judge.  Following <u>Stern</u>, several courts have held that this "third category" of matters must treated as non-core.  <u>See</u> <u>e.g.</u>, <u>Reed v. Linehan (In re Soporex, Inc.)</u>, 463 B.R. 344, 364-65 (Bankr. N.D. Tex. 2011) (finding that nothing prevents bankruptcy courts from issuing proposed findings of fact and conclusions of law with regard to core proceedings, which, following <u>Stern</u>, may no longer be finally adjudicated by a bankruptcy judge); <u>Field v. Lindell (In re The Mortgage Store, Inc.)</u>, 464 B.R. 421, 427-28 (D. Haw. 2011) (finding that if a bankruptcy court is not permitted to enter a final judgment on certain core proceedings, it should enter findings and recommendations as under 28 U.S.C. § 157(c)(1)); <u>Paloian v. Am. Express Co. (In re Canopy Fin., Inc.)</u>, 464 B.R. 770, 775 (N.D. Ill. 2011) (finding that the Supreme Court indicated in the <u>Stern</u> decision that matters which have been removed from "core" jurisdiction should relegated to the category of "related to" matters); <u>In re Olde Prairie Block Owner, LLC</u>, 457 B.R. 692, 700 (Bankr. N.D. Ill. 2011)

(continued...)

C.

Finally, this Court finds that consent can be implied from the action (or inaction) of the parties to a proceeding.

Stern clearly stands for the proposition that consent can be implied through the statements of a party and by a party's delay in contesting the ability of a non-Article III tribunal to adjudicate the action.  See Stern, 131 S. Ct. 2607-08.  Indeed, the Supreme Court determined that through his actions, statements acquiescing to adjudication by the bankruptcy court, and failure to object to bankruptcy court adjudication, the claimant in Stern had implicitly consented to the bankruptcy court hearing and determining his non-core defamation claim, and waived any arguments to the contrary.  See id.  Moreover, the Supreme Court concluded that through the claimant's statements that he was "more than pleased" and "happy to litigate" his defamation claim in the bankruptcy court, the claimant in Stern had impliedly consented to final adjudication by the bankruptcy court. Id.

Stern was not the first time in recent years that the Supreme Court has recognized implied consent to final adjudication by a non-Article III tribunal.  In Roell v. Withrow, 538 U.S. 580 (2003), the Supreme Court held that consent to the entry of a final judgment by a non-Article III magistrate judge can be inferred from a party's conduct during litigation.  Roell, 538 U.S. at 591.  The majority in Roell reasoned that by continuing to appear before a full-time magistrate judge after being advised of their right to have the matter adjudicated by a district court judge, two members of a prison medical

_____

27(...continued)
(finding that counterclaims like those adjudicated in Stern must be treated as non-core proceedings).  These courts have, therefore, logically concluded that once treated as non-core, this third category is subject to the consent provision of 28 U.S.C. § 157(c)(2).  See id.  This Court agrees and, thus, finds that to the extent such a "third category" of matters exists, consent of the parties will suffice to permit final adjudication by bankruptcy courts.

staff had "clearly implied their consent" to final adjudication of the matter by the magistrate judge in question.  Id. at 586.

In both Stern and Roell, the Supreme Court also recognized the inherent danger in allowing a party that had consistently appeared before a tribunal without protest to suddenly change its position, and assert that the tribunal in question no longer maintains the ability to finally adjudicate the matter before it.  In Roell, the Supreme Court concluded that inferring consent was appropriate under the circumstances because it "checks the risk of gamesmanship by depriving parties of the luxury of waiting for the outcome before denying the magistrate judge's authority." Roell, 538 U.S. at 590.  In Stern the Supreme Court  went further and actually criticized the claimant's attempt to "sandbag" the bankruptcy court by belatedly raising the objection **after** he had spent over two years litigating his claim in the bankruptcy court without complaint.  Stern, 131 S. Ct. at 2608.  The Supreme Court went on to say that if the claimant believed that the bankruptcy court did not maintain the constitutional authority to finally adjudicate his defamation claim "he should have said so- and said so promptly." Id. at 2608.

Since the Stern decision, several other courts have persuasively concluded that a party may impliedly consent to final adjudication of certain matters by a non-Article III bankruptcy court.  See e.g., Custom Contractors, 462 B.R. at 909 (concluding that by litigating for more than an year without filing a motion to withdraw the reference, the IRS impliedly consented to final adjudication of a trustee's complaint to recover allegedly fraudulent transfers); Hawaii Nat'l Bancshares, Inc. v. Sunra Coffee LLC (In re Sunra Coffee LLC), Bankr. No. 09-01909, Adv. No. 10-90009, 2011 WL 4963155, *5-6 (Bankr. D. Haw. Oct. 18, 2011) (concluding that a guarantor had impliedly consented to final adjudication of a complaint in foreclosure by the bankruptcy court when he failed to

respond to either the notice of removal or motion for deficiency judgment filed in the case) (citations omitted).  This Court agrees.

Thus, following clear precedent established by the Supreme Court, this Court must recognize implied consent as a viable means of consenting to final adjudication of Article III cases and controversies by a non-Article III bankruptcy court.

D.

Applying the facts of the instant case to the consent analysis above, it is clear that both parties consented to adjudication of this action before this Court.

Initially, Buncher removed the pending case to this Court and has never challenged the ability of this Court to adjudicate the matters before it. (See Adv. No. 10-2495-JAD, Doc. #1).[28]

With regard to ARDI, consent is clear from statements made on the record as well as its inaction as the case proceeded in this forum.  At the hearing on the *Motion to Reopen Bankruptcy Case to Enforce Bankruptcy Court Order*, Counsel for ARDI conceded that the action in question could be tried and finally adjudicated by the bankruptcy court. Once the Honorable M. Bruce McCullough[29] offered his opinion from the bench that the question of whether or not the Barge Facility had been removed was a matter of interpreting the bankruptcy court's prior order, Counsel for ARDI stated that he "had no preference on courts." (See Audio Recording of Hearing Held in Courtroom B, September

---

[28]  Buncher has also consented through the *Joint Discovery Plan and Statement of Estimated Time of Trial Dated February 1, 2011* and the later filed *Joint Discovery Plan and Statement of Estimated Time of Trial.* (See Adv. No. 10-2495-JAD, Doc. #25, ¶ 12 and Doc. #41).

[29]  On August 30, 2010, the involvement of the Honorable Bernard Markovitz was terminated and the Debtor's main bankruptcy case was transferred to the Honorable M. Bruce McCullough.  (See Case No. 07-24515-JAD, Doc. #66).  Following the passing of Judge McCullough, the instant bankruptcy proceeding was assigned to this Court pursuant to General Order 2010-09.

7, 2010 (3:35 - 3:36 PM)).  At no point subsequent to this hearing did ARDI move to have the matter remanded to state court.

In addition, ARDI twice consented in writing to have this Court finally adjudicate the non-core matters between ARDI and Buncher.[30]  The first written consent was contained in the *Joint Discovery Plan and Statement of Estimated Time of Trial Dated February 1, 2011*, wherein the parties agreed that "[i]f the matter upon which the above-captioned adversary proceeding is a non-core matter . . . the parties <u>do</u> consent to the entry Final Order . . ." by the bankruptcy court.  (<u>See</u> Doc. #25, ¶ 12) (emphasis in original).  ARDI later re-affirmed its consent in a *Joint Discovery Plan and Statement of Estimated Time of Trial* with regard to the third party complaint filed by Buncher against ARDI stating specifically that the parties "resubmit, reaffirm and adopt the Joint Discovery Plan and Statement of Estimated Time of Trial previously submitted . . . ." (<u>See</u> Doc. #41).

This Court finds that through its pleadings, statements of counsel, and by continuing to litigate this matter over a period of eight months without moving to remand the action to state court, ARDI has consented to final adjudication of all core and non-core matters by this Court.[31]  Once ARDI provided its consent, it could not be withdrawn

---

[30]  Counsel for ARDI did request a jury trial in the original Complaint filed in state court (<u>See</u> Adv.No. 10-2495, Doc. #1, Exhibit "C").  Counsel also raised his jury trial request at the hearing to reopen the bankruptcy case held September 7, 2010. (<u>See</u> Audio Recording of Hearing Held in Courtroom B, September 7, 2010 (3:35 - 3:36 PM) ("I guess the jury part will be in front of the district court.").  However, as part of the *Joint Discovery Plan and Statement of Estimated Time of Trial Dated February 1, 2011*, Counsel gave his express consent to have any jury trial requested conducted by this Court. (<u>See</u> Doc. #25, ¶ 11).  Therefore, Counsel's jury trial demand does not alter this Court's Article III analysis in the present action.

[31]  As this court has previously concluded that both express and implied consent of the parties suffice to permit final adjudication by a non-Article III bankruptcy court, there is no need to split hairs by determining whether a party's consent to final adjudication of non-core matters by the bankruptcy court constitutes express or implied consent as to the final

(continued...)

without a showing of good cause.  See <u>Bayonne Medical Center</u>, 2011 WL 5900960, at *6;

<u>Olde Prairie Block Owner</u>, 457 B.R. at 702 (citing <u>Carter v. Sea Land Servs., Inc.</u>, 816

F.2d 1018, 1021 (5th Cir. 1987)).  No such good cause has been shown or articulated.

## **VI.**

For the reasons expressed above, the Court finds that there are no genuine

disputes of material fact and, as a matter of law, ARDI is not entitled to a judgment on

its cause of action for conversion by virtue of the enforcement of the Court's Consent

Order dated April 3, 2008.   Because the Consent Order precludes the claim for

conversion, the motion for summary judgment seeking dismissal of the complaint filed

by Buncher shall be granted.  An Order consistent with this *Memorandum Opinion* shall

be entered.

**Dated**: <u>March 30, 2012</u>                          <u>  /s/ Jeffery A. Deller              </u>
                                                      **Jeffery A. Deller**
                                                      U.S. Bankruptcy Judge

**case administrator to serve:**
     Robert O Lampl, Esq.
     Dennis M. Blackwell, Esq.
     Robert D. Finkel, Esq.
     Joseph F. McDonough, Esq.
     Office of the United States Trustee

---

[31](...continued)
adjudication of statutorily defined core matters.